IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MARK N. BEGLEY,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF KAUAI, KAUAI POLICE DEPARTMENT, GEORGE FREITAS, MARTIN W. CURNAN, and DAVID NAWAI,<br><br>Defendants. | CIVIL NO.: | CV03-00162 DAE KSC |

COPY

Deposition noticed by: Michael J. McGuigan, Esq.

DEPOSITION OF D. THOMAS ROGERS, M.D.

Taken on behalf of Defendant at Dr. Rogers' office, 39 Kamehameha, Kahului, Maui, Hawaii, commencing at 2:00 p.m. on November 3, 2005.

THIS TRANSCRIPT IS WORK PRODUCT. DISTRIBUTION OF DUPLICATES IS NOT AUTHORIZED.

REPORTED BY: LYNANN NICELY, RPR/RMR/CSR #354



EXHIBIT "B"

# A P P E A R A N C E S

For the Plaintiff:

CHRIS BOUSLOG, ESQ.
Law office of Chris Bouslog
Four Waterfront Plaza, Suite 480
500 Ala Moana Boulevard
Honolulu, Hawaii 96813-4908
(APPEARING VIA TELEPHONE)

For the Defendant:

MICHAEL J. McGUIGAN, ESQ.
Reinwald o'Connor & Playdon, LLP
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2400
Honolulu, Hawaii 96813
(APPEARING VIA TELEPHONE)

INDEX


EXAMINATION BY: PAGE

Mr. McGuigan.......................... 4


EXHIBITS


EXHIBIT PAGE

1 Dr. Rogers' file.................. 6

2 Dr. Rogers' CV....................

(Pursuant to Rule 14 of the Rules Governing Court Reporting in Hawaii, the Reporter's Disclosure was made and is attached hereto.)

* * *

D. THOMAS ROGERS, M.D.,

called as a witness by and on behalf of Defendants, having been sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. McGUIGAN:

Q Good afternoon, Doctor, thank you for taking the time today to be with us.

A You're welcome.

Q You've been deposed on a number of occasions, correct?

A That's correct.

Q Do you need me to go through the preliminary instructions in any regard?

A No.

Q Okay. Hopefully we won't be too long this afternoon. We have asked to take your deposition in connection with a claim brought by Mark Begley against my client, Marty Curnan and others, arising out of an assault upon him on May 17, 2002. What records do you

have before you pertaining to Mark Begley?

A Yes. From Kauai Medical Clinic, from Dr. Leon Liem, M.D., Queens Medical Center, Peter Rossi, R-O-S-S-I, M.D., Tanya Schwartz, S-C-H-W-A-R-T-Z, Ph.D., and Wilcox Memorial Hospital. And I also have my evaluation on him done June 14, 2004.

Q That would be the extent of your file?

A Yes.

Q How did you come to be engaged on behalf of Mr. Begley? Who contacted you first? Still there?

A Yes, I'm trying to see if there was a cover letter when I did an IME evaluation on him or not.

Q Okay. Take your time.

A I believe it was at the request of Mr. Bouslog.

Q Was that by a phone call or in writing?

A I have something in writing June 1, 2004, from Mr. Bouslog in regards to doing this IME.

Q Do you know Mr. Bouslog?

A No, sir.

Q Pardon me?

A No, sir.

Q You've never provided services to any of his clients previously, to your knowledge?

A Not that I'm aware of or remember.

Q Where did you see Mr. Begley?

A June 14, 2004.
Q And where?
A In my office here on the island of Maui.
Q Was he alone?
A I believe he was, yes.
Q Did you take a history from him?
A Yes, I did.
Q Was that taped or handwritten?
A I have some handwritten notes and then after I saw him, I dictated it.
Q Did you retain the notes?
A Yes, I did.
MR. McGUIGAN: Madam reporter, at the conclusion of the deposition, I would like to have you mark the doctor's file as Exhibit 1 with all of the documents.
(Deposition Exhibit Number 1 was marked for identification.)
Q How long did the evaluation take, Doctor, from start to finish?
A As far as my taking a history and examining him?
Q Correct.
A About an hour.
Q One hour?

A Approximately an hour.

Q Okay. How did Mr. Begley appear to you when he presented?

A I'm not quite sure I understand your question.

Q Could you describe his demeanor?

A Mildly depressed.

Q Did he express that to you or was that an observation that you made?

A That would be my observation of him.

Q And what was it that led you to the conclusion that he was mildly depressed?

A That's just from what I remember the way he appeared to me.

Q Okay. I have your independent medical evaluation here in front of me obviously and it bears the history portion that you referred to. Does the recorded history that is in the report, is that the entirety of what he related to you, or did he relate more that you do not include in the report?

A In looking at my handwritten notes, it appears there is some other things that I didn't put into that dictated report.

Q And could you tell us what those were?

A Yes. There were certain notations that he thought he'd left the office about 3:00 on May 17th,

2002. There is some notations he thought he got in a car at a cane field. He'd had one or two beers to drink. Mentioned something about an argument. In looking through these notes quickly, I believe those were the only things I didn't mention.

Q Did he identify the person who assaulted him?

A No.

Q Did he say where it occurred?

A I don't think that he knew for sure.

Q Did he identify the people who he was with that evening?

A I didn't write that down. I believe that he did know the people he was with, yes.

Q Did he identify the places that he went by name? I understand that he referred to a cane field, but was he able to describe with any particularity any locations that he was that evening?

A I'm not sure he knew specifically where he was.

Q Was he asked?

A I did not ask him specifically, no.

Q The physical history that he related to you, was that his recitation?

A I'm not quite sure of your question.

Q In the second paragraph of the history, there is a history of physical condition. Do you see that?

A Yes.
Q Did he relate that to you himself?
A I asked him certain questions and I thought those were his responses to them.
Q Did you have the opportunity to confirm or affirm any of those -- any of that history with anyone else?
A No. I had read medical records, but I did not speak to anyone else -- any of his treating doctors.
Q Going to the second page, Doctor, under gait and balance, on the tandem walking.
A Yes.
Q Of what significance is it when you report that he tends to fall to the right side?
A That's indicative of weakness of the right side of the body. May be seen also with trouble with your balance, too.
Q Is that significant in terms of his injury?
A I believe so, yes.
Q And in what regard?
A This can be seen when you have trouble with your inner ear the way he does. Can be seen because there was some injury to the left side of his brain which controls the right side of the body.
Q Was there any other examination done other than

what's reflected in your report?

A No.

Q Let me go to the third page of your report under "Discussion."

A Yes.

Q You felt it would be of value to consider having an ENT evaluation, correct?

A Yes.

Q Do you recommend that to him?

A I felt that we should consider having that done, yes.

Q Did you -- let me ask you this. Have you spoken with Mr. Bouslog after this examination?

A Yes, I have.

Q When was that discussion?

A Shortly before this deposition.

Q Pardon me?

A Shortly before this deposition today.

Q I see. Do you know if an ENT evaluation was ever in fact done?

A I don't believe it has been done to this point in time.

Q You also recommended or thought it would be of value to have an audiogram?

A Yes.

Q Do you know if that's been done?
A I don't believe it has been.
Q Have you been provided with any further neuropsychological testing?
A No.
Q Have you seen Mr. Begley since the date of your examination?
A No.
Q Your concluding paragraph indicates that you felt that he could continue to do light duty work, correct?
A Yes.
Q Did you ever communicated that to the -- first of all, have you ever been in communication with anyone from the Kauai Police Department as a result of this incident or examination?
A I don't believe so.
Q In your evaluation, you state that it would be not safe for him to work as a full duty police officer on patrol duty at this time. Would you make that same statement today?
A If he still has the troubles now that he did then, yes.
Q Do you know what he's doing today?
A I believe he's doing light duty work as a

police officer.

Q Do you know which division he works in?

A No.

Q Did he relate that to you?

A No.

Q Have you spoken with his wife in connection with your evaluation?

A No.

Q Your CV, Doctor, the listing of the cases --

A Yes.

Q -- for deposition or trial.

A Yes.

Q Is that current?

A I would have to check and see. I'm not sure.

Q If you could do that and if it needs amendment, correct it on the deposition page, the correction sheet?

A Okay.

Q I have no further questions, Doctor. Thank you.

A Yes, sir.

MR. BOUSLOG: Thank you, Doctor.

[Concluded at 2:20 p.m.]