KAUAI POLICE DEPARTMENT
PER LT. ALE QUIBILAN
LIHUE

REPORT NO. 02-14800
ASSAULT 1ST

STATEMENT RECEIVED FROM: DR. LEON LIEM

STATEMENT TAKEN BY: LT. ALE QUIBILAN

WITNESS: DET. HANK BARRIGA (B)

DATE & TIME: JULY 18, 2002; 0921 HOURS

Q: Today's date is July 18, 2002; time right now is 0921 hours; and we're located at Dr. Liem's office on Oahu; present is myself, Detective Hank Barriga, and Dr. Liem.

Q: Doctor, first of all, can you state your full name.
A: Leon Liem, L-i-e-m.

Q: And the address here at your office?
A: 2228 Liliha Street, Honolulu, HI

Q: And your phone number here, sir?
A: 808-547-6950.

Q: OK. Dr. Liem, first of all, let me brief you on what we have found out so far, OK. On May 17th of this year, Mark Begley along with several other individuals were at a gathering that afternoon, led into the evening hours, they were consuming alcoholic beverages throughout the evening. Apparently, Mark and another individual got into a verbal argument, which led into a physical confrontation. Our investigation, based on statements taken, was that Mark…they were in this parking lot, they had decided to settle their differences in this parking lot. Now, Mark exits his vehicle, approaches the second party, the other male who is also exiting his vehicle. As they meet each other, the witness is telling us that Mark takes a swing at this…at our suspect, and misses, however he misses. Our suspect returns a single punch which our witness is saying hits Mark somewhere on the jaw or the mouth area, Mark collapses. However, at the same time as Mark is collapsing from that punch, he is caught, the suspect grabs him before he hits the ground. Now, OK, Mark is now discovered to be unconscious, he's making some noises. He's breathing but he's making some…like gurgling sounds and snoring. This is what the description was. Now, our witness and our suspect decide, "Well, we're gonna take Mark home," fix him up, carries Mark towards…into Mark's vehicle. And as they're trying to place him in the passenger seat, our witness says that Mark's head shifts back and hits the corner of the door, going into the vehicle. Didn't that it was that serious, they continue to put Mark in the vehicle. He's still unconscious, he gets home…they drive him home, Mark gets home, he is now able to stand on his feet, somewhat, grabbing the side of the vehicle and he's conscious, and then they get him into the house. And that's pretty much the injury part of it.



EXHIBIT "B"

Q: Now, I guess what we want to find out is, his injuries, is that consistent with our story here?
A: OK, well…I actually saw him four days later when he sought medical treatment. But, you know, the type of injury he had included an intracerebral contusion as well as an epidural hematoma. He also had evidence of skull fractures, fractures of the base of the skull, which are all pretty high…you know, it requires pretty high impact. So a single punch, it would be hard to explain that on a single punch. What…you know, whether he struck his head and did that…that potentially could do that, but it usually it takes quite a bit of force to do that. If he fell and he struck a hard surface with his head, that may account for it. Or you were talking about the side of the door or…potentially, that could be but, you know, it would have to be pretty severe. It was not just a minor bump.

Q: Right. The way it was described is while they're carrying him, because he was unconscious, his head kinda whipped back, you know, it was loose and then just kinda lean back and hit the corner of the post. It's not like they dropped him.
A: Yeah.
Q: They didn't describe it as dropping him.
A: Yeah, . It's difficult to explain it just on what you're describing, but we see this type of injury more with high-speed accidents, like motor vehicle accidents or people who fall, hit their head on hard surfaces, but…
Q: Now…
A: And the other thing is that he had no other medical conditions that would predispose him to have worsening… that some people have, bleeding disorders or something. And I just…(didn't?) seemed like that was the case.

Q: Now, the terminology you used, can you kinda break it down into more…layman terms.
A: Sure. The epidural hematoma is the blood collection that's on the…that above the covering of the brain, there's a covering of the brain called the dura, and there is a blood clot that was on that portion of the brain. If I look at my notes…it was…yeah, on the left side, and then there was also what's called contusions or bruising of the brain on the right side of the brain. And then he also had a bruising or a…you know, shiner, basically from…around the eye, which indicates…and he also had bleeding on his eye, itself, of the eye. And that suggests that there is probably a fracture of the base of the skull. It's very difficult to see sometimes, a fracture, and I don't think we saw it on the CAT scan. But when you have that type of findings, that usually suggests of a fracture.

Q: Now, the injuries that…you said there was bruising on the right side of his brain.
A: Correct.
Q: What would cause that if he was struck on the left side?
A: Well, the brain is mobile inside of the skull, so if you're hit, for instance, on the left side, it will…the brain can shift and then actually hit against the skull on the opposite side. Quite commonly seen. It's something called the contra contusion.

Q: And that's related to a high impact?
A: Usually that suggests the high…high impact, what we call high-acceleration injury.

Q: OK. And is there incriminate damage at this point?
A: Well, I had…the last time I saw him I suggested that he undergo a neuropsychological evaluation, because on examination we don't see any major deficits or major injury to the brain but there could be significant cognizant or psychological problems associated with this type of injury. And so that…I don't think I have a report from that, but that would give us a better prognosis on…what extent the injury is and what the prognosis is.

Q: OK. So right now we can't say there's any permanent or any brain damage?
A: Well, based on what we see, it looks like there was damage done but the extent of it is hard to…
Q: OK.
A: …to categorize at this point. Was that done, yet, I don't…I'm not…I have not got any feedback on that but we had requested that…information.

Q: Yeah, we mentioned that they follow-up but we don't have that information…
A: OK.
Q: …if he had gone

Q: Now, what is the…I guess we would be guessing, then, at this point what his…I guess recovery would be or any…
A: whether there are long-term problems. And with these type of injuries, sometimes it's very difficult to tell because the…you know, these patients can function, you know, when asked to do so, but things like their perseverance, their concentration ability, memory, all those things which are kinda subtle finding or difficult to…problems with that are difficult to bring up unless you're into like a stressful job situation where that may become a problem.

Q: Now, one of the physicians we met with said that if he didn't…if his memory didn't come back about what occurred that night at this point, it's not gonna come back at all. Is that…
A: There's a very good chance of it if he becomes amnestic or doesn't remember that event. When I spoke to him he had no memory of the event. And he also does seem to have some memory problems for new memory ever since then, as well.

Q: OK. And that may be permanent or it may be just temporary?
A: Yes. Yeah, I mean usually we can see improvements but there are components of it, which may be permanent. And, again, a neuropsychological evaluation would help. Sometimes we need to do serial examinations to see if he's improving or…or it's remaining…looking like a permanent type of thing.

Q: What's your best guess, as far as time, you know, on this, checking with Mark and see if he's improving?
A: Yeah. Unfortunately, it takes time for the brain to heal, and we're talking a period of months, sometimes even years, but at least a year, I would say.
Q: Before we know something worth…
A: Whether you know whether something is gonna be permanent or not, because you can still see improvement several months or even years afterwards.
Q: Right. When was the last time you…did you see Mark?

A: I saw him…yeah, it says…I believe it's the 13th of June, yeah.
Q: . Dr. Liem, are you the…I guess the primary physician for Mark for his care or…
A: Well…no, I don't…who is his primary physician? I'm here…is it Dr. Boyd or…I'm not a primary , I'm a specialist, though.
Q: OK.
A: So it would be a primary care doctor that was taking care of'em. I see also another name here. because it's a…lot of patients. It's hard to keep track of it, but I also have here Rick Majusca(sp?)…? I have that as the primary doctor but….

Q: So, Dr. Liem, your part of Mark's treatment and recovery is…you still have a part in this?
A: Yeah, but my part is actually…you know, as a neurosurgeon, we're…our part is usually the acute care of the head injury, so, you know, I took care of him in the hospital when he was …OK, acutely, but you know when it's becoming less acute now…
Q: Right.
A: …then we turn it over to the primary care doctors, the neuropsychologists, etc.

Q: OK. OK, so it's pretty much we're looking at this as you're complete with your treatment and…
A: Yeah, I don't foresee any treatment because my treatments are usually surgical…
Q: Right.
A: …and it doesn't look like he needs surgery, but….
Q: OK.

B: You know, you said that there is injury, right, to his brain. That injury, you're unable to determine if it's permanent or not?
A: Correct.

B: And that's the injury to the brain or to the memory we're talking about?
A: Well, the part of the brain that controls the memory, yeah.

B: I remember looking at the CAT scan, it looked like there was swelling or something in the head, and that is what affected the…
A: Yeah, memory and concentration, things like that. That's the part of the brain, the frontal lobe, that's what it does.

B: I was wondering, how long do you think…you know Mark is a police officer…
A: Yeah.
B: …and this has a direct effect on his job performance. How long would you think he needs to be out of work?
A: Again, I think a neuropsychological evaluation would tell us how…you know, what his actual deficits are, how much of a problem . And then that can give…have a better gauge. I mean physically, he's probably able to do it, but it's the cognizant function that…you know, you can't function well if you're not able to concentrate or have memory problems and things like that, even though physically you can do it, so.

Q: Dr. Liem, on Mark's injury…if a standing position, could he have fell and sustain that type of injury?
A: Yeah, I think falling onto a hard surface…
Q: Right.
A: …can do that.
Q: On a roadway or a parking lot. Well, they were in a parking lot. The asphalt, that was the hard surface.
A: That can be, yeah. I think that's sufficient force to do that.

Q: Also, would it be possible if a person had a weapon or some sort, something…a hard object in the hand causing that?
A: Yeah, that would…
Q:
A: …that would be more consistent with the…with injuries.
Q:
A:

Q: But a punch to the mouth …
A: not. I know we see…we see boxers all the time and other people with injuries. Usually the injuries caused not by the punch but because they land hard on the ground.

Q: OK. That's it?
B: That's it.

Q: Thank you, doctor.
A: You're welcome.

Q: Time right now is 0935 hours.

pr
8/20/02

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARK N. BEGLEY,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF KAUAI; KAUAI POLICE DEPARTMENT; GEORGE FREITAS; MARTIN W. CURNAN; and DAVID NAWAI;<br><br>Defendants. | CIVIL NO. CV 03-00162 KSC<br><br>**CERTIFICATE OF SERVICE** |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the within will be duly served on the following in the manner described below:

| | Mailed | Delivered |
|---|---|---|
| MICHAEL J. McGUIGAN, ESQ.<br>ELMIRA K. L. TSANG, ESQ.<br>Reinwald O'Connor & Playdon<br>Pacific Guardian Center<br>Makai Tower, Suite 2400<br>733 Bishop Street<br>Honolulu, Hawaii 96813<br><br>Attorneys for Defendant<br>MARTIN W. CURNAN | (X) | |

| | Mailed | Delivered |
|---|---|---|
| DAVID NAWAI<br>2931 Kalena Street, No. 2<br>Lihue, Hawaii 96766<br><br>Pro Se Defendant | (X) | |

DATED: Honolulu, Hawaii, February 21, 2006.

MARK R. ZENGER
DONNA E. RICHARDS
CHRISTOPHER S. BOUSLOG
Attorneys for Plaintiff
MARK N. BEGLEY