# MEMORANDUM IN SUPPORT OF BEGLEY'S OBJECTION TO DEFENDANT GEORGE FREITAS' MOTION FOR ATTORNEY'S FEES AND COSTS

## I. INTRODUCTION

Defendant George Freitas ("Freitas" or "Chief Freitas") has moved for recovery of his attorney's fees and costs. Freitas states that Plaintiff Mark N. Begley's ("Begley" or "Begley's") claims were "frivolous, objectively unreasonable, and meritless when made" (Freitas' memorandum in support of motion, page 8, paragraph 4). Freitas further states (at page 9 of his memorandum) that "plaintiff's claims against Defendant Freitas were based upon the alleged actions/inactions of Defendant Curnan" and that even after being allowed additional time to conduct discovery "plaintiff was unable to support any of his wild allegations against Defendant Freitas".

Begley believes there is sufficient reason for the District Court to deny Freitas' recovery of attorney's fees and costs. Begley's lawsuit was not unreasonable, frivolous, meritless, or vexatious. Additionally, Begley believes that under the guidelines established by the Ninth Circuit there is sufficient reason to deny the County's recovery of attorney's costs. Begley also believes that the County's Bill of Costs is not clearly explained, as the individual billings in its attachment rarely show any detail that would explain what was being done (copied,

etc.) and for what purposes. Some of these billings, "Online Re(search?)" are clearly not recoverable as attorney's costs.

## II. DISTRICT COURT HISTORY

On April 8, 2003 the attorneys for Plaintiff Mark N. Begley (" Begley"), filed a complaint on his behalf against Defendants County of Kauai, Kauai Police Department ("KPD"), George Freitas ("Freitas"), Martin W. Curnan ("Curnan"), and David Nawai ("Nawai").

On January 28, 2005 the District Court, Judge David A. Ezra, filed an order denying Motions for Dismissal and Summary Judgment by Defendants Curnan and Freitas.

On July 26, 2005 the District Court, Magistrate Judge Kevin S. Chang, issued an order granting in part and denying in part Defendant Curnan's renewed Motion for Summary Judgment.

On October 4, 2005 the District Court, Magistrate Judge Kevin S. Chang, issued an order granting Defendant Freitas' renewed Motion for Summary Judgment (and Defendant County of Kauai in joinder), dismissing those defendants from the lawsuit.

On November 11, 2005 Magistrate Judge Kevin S. Chang mediated a settlement conference between Begley and the various defendants.

On January 17, 2006 a status conference was held. Magistrate Judge Kevin S. Chang again mediated settlement discussion between Begley and the various defendants. No settlement was reached.

On February 10, 2006 Begley's attorney, Chris Bouslog, withdrew as co-counsel for Begley.

On March 7 and 8, 2006, the remaining claims against Curnan and Nawai came before the District Court for a bench trial.

On March 9, 2006, the District Court granted Curnan's motion for involuntary dismissal of the claims of conspiracy and intentional infliction of emotional distress. The court also granted defendant Nawai's motion for involuntary dismissal of the claims of conspiracy, intentional infliction of emotional distress, violations of 42 U.S.C 1983, and false imprisonment.

On April 6, 2006 the District Court entered judgment in favor of defendants Curnan and Nawai as to all remaining claims pursuant to "Findings of Fact and Conclusions of Law" filed on March 30, 2006.

On April 7, 2006 Begley filed a Notice of Appeal to the Ninth Circuit Court of Appeals regarding the District Court's various judgments in favor of the defendants.

On April 11, 2006 the District Court entered an amended judgment in favor of the various defendants pursuant to the District Court's prior granting of Summary Judgment in favor of the various defendants

On April 17, 2006 Begley filed his Designation of Record on Appeal.

On April 20, 2006 Defendant Freitas filed a motion for his attorney's fees and costs.

On April 25, 2006 Defendant Curnan filed a Bill of Costs and memorandum in support of Bill of Costs.

On April 26, 2006 Defendant County of Kauai filed a Bill of Costs and memorandum in support of Bill of Costs.

On May 11, 2006 attorneys Richards and Zenger withdrew as counsel for Begley. The District Court gave Begley until May 31, 2006 to file any objections to the defendants' Motion for Fees and Bills of Costs.

## III. ARGUMENT

In his Motion for attorney's fees, Defendant Freitas references Margolis v. Ryan, 140 F.3d 850, 854 (9th Cir. 1998), which states that "a district court may award attorney's fees to a prevailing defendant in a civil rights case if the plaintiff's claims are 'unreasonable, frivolous, meritless, or vexatious'."

In the Margolis case, the court held that Margolis "failed to identify facts that would support (his) claim", and that Margolis "presented **no specific facts**...from which a conspiracy could be inferred". Margolis did not "set forth any facts to demonstrate an agreement" between the Defendants. Margolis relied on his "conclusory allegation" that since the Judge decided in favor of the Defendants, the Judge was part of a conspiracy against Margolis.

In *Margolis,* the Ninth Circuit cited Christiansburg Garment Co. v. EEOC, 434 U.S. 412. In *Christiansburg* the U.S. Supreme Court stressed restraint in granting attorney's fees to a successful Defendant, as opposed to a successful Plaintiff. They recommended that the "District Court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims" and "Even when the law or facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Christiansburg* at 422 and 701.

In the Begley complaint, Begley identified numerous **specific facts** from which a conspiracy could be inferred (See "Chief George Freitas" below). There was a factual basis for Begley's beliefs and claims. Begley's facts were not "conclusory" or "wild allegations", because **Begley did identify the underlying**

**facts upon which his inferences were based**. Begley gave 61 pages of detailed information (dates, places, KPD report numbers, activities and names of witnesses) in Begley's Answers to Interrogatories on July 8, 2004. Begley gave another 71 pages of information in his Response to Request for Production of Documents on December 1, 2004. Begley has given a much more specific history of events and statements than was given by Plaintiff Dominguez in Dominguez-Curry v. Nevada Transportation (9th Cir. 2005).

There appears to be very limited case history under Title 42 of the United States Code in which an unsuccessful plaintiff's claims were found to be frivolous, unreasonable, or without foundation. In Adkins v. Briggs & Stratton Corp., 159 F.3d 308, an employee's action against his employer was frivolous **when the employee admitted** that the employer had no knowledge of the employee's disability at the time of the employee's termination, and that his disability was not even diagnosed until four months later. 42 USCS § 12205, at interpretive notes and decisions # 6, states that the court cannot adopt differing standards of frivolousness for deciding a motion to dismiss or for deciding a motion for attorneys fees. This is an example of the threshold that courts place on these standards.

## 1983 COLOR OF LAW

Even if an off-duty police officer is held not to have acted under color of state law for purposes of liability under 42 U.S.C. § 1983, a § 1983 action may

arguably be maintained against the municipality based on municipal policy or custom, because under this theory the municipality itself is the state actor and its action in maintaining the alleged policy supplies the color of law requirement. Gibson v. Chicago (1990, CA7 Ill) 910 F.2d 1510.

When a municipality's procedure of reprimand is so inadequate as to ratify unconstitutional conduct, the municipality may be liable under § 1983. Skevofilax v Quigley, 586 F. Supp 532, 810 F.2d 378, 481 US 1029. The court made no distinction between the actions of off-duty and on-duty police officers, stating that where a municipality's failure to train, supervise, or discipline police officers is reckless or grossly negligent, this will be taken to mean that an official policy or custom which results in constitutional violations exists, or where there is conduct by officials showing implied authorization, approval, **or acquiescence** in unconstitutional conduct, municipal liability will be found under § 1983.

## CHIEF GEORGE FREITAS

In Begley's Complaints, Answers to Interrogatories, Declarations, and various exhibits, the following are some of the facts and evidence Begley has offered based on personal observations, direct verbal communications to Begley, and/or written communications:

1. Prior to the serious injury to Begley, there existed a special relationship between Chief George Freitas and Lieutenant Martin Curnan. (i.e. Curnan told Begley that Freitas and Curnan were "in the same boat", referencing a citizen's complaint against Curnan in which Freitas took no action. The citizen who made this complaint, Jennifer Davis, also spoke directly to Begley about Chief Freitas' refusal to take any action on her complaint against Curnan.
2. After the serious injury to Begley, there still existed a special relationship between Chief George Freitas and Lieutenant Martin Curnan. Chief Freitas told Begley that Curnan was a "nice guy", and it would be "healthier" for Begley if Begley felt the same way.
3. No later than the day on which Begley was flown to Honolulu via air ambulance (May 21, 2002), Chief Freitas was informed of the serious nature of Begley's injury. (**Refer to Attachment "A"** for Lieutenant Scott Yagihara's letter, taken from the County of Kauai's disclosure at C0348-C0350) Freitas did not promptly initiate any investigation, criminal or internal, into the matter.
4. In spite of the serious injury to Begley, including brain damage and clinical evidence of a basilar skull fracture, Chief Freitas and KPD did not initiate a criminal investigation into Begley's injury until about 5 weeks later, and

only after being prompted by Begley and his wife regarding the inaccuracy of statements by Lieutenant Curnan. Experienced police officers know that generally, the longer you wait after a crime, the more difficult it is to solve a crime.

5. During the tardy criminal investigation, KPD investigators arrested Defendant David Nawai for Assault 1st degree, but Chief Freitas and KPD never treated Curnan as a suspect in the assault on Begley or even as an accessory to the assault, even after Curnan admitted to KPD investigators that he lied to Begley's wife regarding the cause of Begley's serious injuries.
6. Chief Freitas and KPD never conducted an internal investigation into the activities of Lieutenant (and Acting Assistant Chief) Curnan on the night Begley was seriously injured. Chief Freitas had ignored other reports of wrong doing by Lieutenant Curnan, before and after Begley's injury.
7. When Begley later received further information regarding Curnan's criminal associations and activity, Begley referred the information and Confidential Informant directly to the FBI. This angered Chief Freitas, and Chief Freitas interrogated Begley in front of other high-ranking KPD personnel. (Freitas did not inform Begley of Begley's Constitutional Rights or Garrity Rights prior to this interrogation.) On the following day, Begley was told by

Lieutenant Lawrence Manuel that Chief Freitas "Wants to hang your (Begley's) ass."

8. Chief Freitas engaged in a series of retaliatory acts against Begley, and threatened illegal action against Begley, including but not limited to; threatening to terminate Begley's employment if Begley's injury was permanent, and if Begley did not convince Begley's doctor to give Begley medical clearance for full police duty. KPD Lieutenant K.C. Lum was with Begley on one of these occasions. All of these acts were done during regular work hours and while Freitas was on-duty as the Chief of Police for KPD.

9. Following an inquiry by Representative Mina Morita, Chief Freitas called Begley into the Chief's office and ordered Begley not to talk to the press regarding the assault on Begley. Deputy Chief Wilfred Ihu and Lieutenant Miles Tanabe were present at the time.

10. In 2001, prior to the assault on Begley, Chief Freitas was investigated by John Ko, an investigator from the Honolulu Police Commission, on behalf of the County of Kauai Police Commission. Among other charges allegedly sustained by John Ko's investigation, was the charge of Hindering Prosecution in the criminal investigation of another KPD officer. No action was taken by the County of Kauai regarding this serious charge. The report from this investigation was not released to Begley by the County of Kauai.

A copy of the report was submitted with Alvin Seto's Federal lawsuit against Chief Freitas, but remains sealed by the Hawaii District Court. Refer to Seto v. Freitas, HI DC civil no. CV03-00259. **Also refer to Attachment "B".**

11. There have been at least three (3) lawsuits against Chief Freitas for retaliating against his employees. The Alvin Seto lawsuit was settled by the County of Kauai. The Jacquelyn Tokashiki lawsuits, in State and Federal Courts, were still active.

12. The County of Kauai Police Department was, and remains to be, the only Police Department in the State of Hawaii that does not have an Internal Affairs Division, unit or any form of permanent or full-time position for such purpose. All other police departments in the State of Hawaii, and most departments nationwide, have an internal affairs unit that investigates allegations of wrong-doing against police employees. These units are staffed by highly trained investigators. The absence of such a unit at KPD can only encourage wrong-doing by KPD officers. The limited and tardy criminal investigation into the Begley assault was handled by investigators, chosen by Chief Freitas, who were not highly trained in internal investigations.

## CONSPIRACY

"A conspiracy can be inferred from conduct and need not be proven by evidence of an express agreement." Ward v. Equal Employment Opportunity Comm'n, 719 F.2d 311, 314 (9th Cir. 1983)

A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from the defendant's actions. "Acts which seem otherwise innocent, when viewed in the context of the surrounding circumstances, may justify an inference of complicity." United States v. Calabrese, 825 F.2d 1342, 1348 (9th Cir. 1987) and United States v. Batimana, 623 F.2d at 1368 (9th Cir. 1980)

In supporting an allegation against Freitas' for involvement in a conspiracy against Begley, **Begley did not need to state or prove that Freitas was present during the assault on Begley.** An individual's involvement in a conspiracy is separate from, and may occur before, during, or after the crime itself.

In Johnson v. Duffy, 588 F.2d 740 (9th Cir. 1978), the Ninth Circuit held that "***personal participation is not the only predicate for section 1983 liability***." Gilbrook v. City of Westminster (9th Cir. 1999) Emphasis added.

Begley believes that the purpose of the serious assault on Begley, the so-far successful attempt to cover it up, and the retaliatory acts by Freitas against Begley,

were for the purpose of quieting Begley. By acts of commission and omission, Chief Freitas and the Acting Assistant Chief, Lieutenant Martin Curnan, certainly did their part to contribute to this purpose.

## RETALIATION

Adverse employment action is not limited to actual termination or demotion in position and pay. It may be limited to just the threat of termination. See Ceballos v. Garcetti (9th Cir., 02-55418) quoting Rutan v. Republican Party of Ill., 497 U.S. 62, 75-76 (1990) "There are deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy".

See also Coszalter v. City of Salem (9th Cir., 00-36097) "To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden."

## DISCOVERY

The Defendants have repeatedly clamored about Begley's alleged failure to conduct discovery, or to produce any evidence as a result of discovery. The

Defendants infer that this alleged failure in discovery shows that Begley's declarations are completely unsupported.

Begley recognizes that his former attorneys did not conduct discovery with the zeal that Begley requested from them. **Refer to Attachment "C"** showing discovery-related e-mails from Begley to his former attorney Chris Bouslog. At the early stages of this complaint, Begley kept in mind that his lead attorney, Chris Bouslog, suffered the loss of both mother and father. HOWEVER, the County of Kauai clearly and purposely resisted discovery by Begley's former attorneys.

On January 24, 2005 there was a hearing before the District Court, Judge David A. Ezra ("Judge Ezra"), regarding Motions for Dismissal and Summary Judgment by Defendants Curnan and Freitas. During that hearing, the District Court gave Begley's attorneys a discovery extension because criminal investigations by the Kauai Police Department had not previously been completed. The criminal report of the assault on Begley was not yet available. At that time, Judge Ezra warned the County of Kauai to promptly produce documents. **See page 15 of Attachment "D"** (Transcript of Proceedings before the Honorable David Alan Ezra, Chief United States District Judge, on January 24, 2005.) Attorney David Minkin ("Minkin" or "Mr. Minkin"), representing the County of Kauai, told the Honorable David Alan Ezra that he (Minkin) anticipated "being able to produce the County police reports early next week" (Transcript of Proceedings

page 15 at line 23). **Mr. Minkin did not**. In fact, Mr. Minkin did not produce any of the County police reports until five months later, on June 21, 2005, after renewed motions for summary judgment had been filed with Magistrate Judge Kevin S. Chang, and several weeks after Begley's attorneys had filed another request, and then a subpoena for the documents.

The fact is that THE COUNTY'S ATTORNEY, MR. MINKIN, HAD A COPY OF THE REPORT ON BEGLEY'S ASSAULT FROM JANUARY 18, 2005, PRIOR TO HIS HEARING BEFORE THE HONORABLE DAVID ALAN EZRA. MR. MINKIN LIED TO THE COURT, AND THEN WITHHELD PRODUCTION OF THE KPD DOCUMENTS FROM BEGLEY FOR ANOTHER 5 MONTHS. **Refer to Attachment "D".**

When the County of Kauai's production of documents, numbered C0001-C0440, was finally made to Begley's attorneys on June 21, 2005, only a very small portion of the documents that were requested (on 05/24/05 and 06/01/05 respectively) were included. (**Refer to Attachment "E"** for Begley's requests.)

The limited documents surrendered by the County of Kauai remain incomplete. Four (4) listed witness statements from the assault investigation, including a tape-recorded statement, were not turned over to Begley or his former attorneys as requested. This includes statements identified (but not present in the police report produced by Mr. Minkin) as those of Alfred Dannog, Pauli

Velasquez, Robert Miguel, and Rae Hiramoto. **Refer to the last page of Attachment "D".** About half of the County's 440-page disclosure consisted of duplicates.

Other requested KPD reports have not been surrendered. The County has made the inference that the other documents requested by Begley do not exist. However, Begley knows for certain that other identified documents do exist because he has read them. Fellow KPD officers, and witnesses known and identified by Begley in Begley's 61-page Answers to Interrogatories, were involved in these investigations.

Many of the facts stated by Begley, during the course of this complaint, are based on Begley's own personal knowledge and experience, including comments made directly to Begley by Chief Freitas and others, and/or actions witnessed by Begley. Begley was/is competent to testify on these matters. Other facts identified by Begley are in regards to the inaction of Chief George Freitas and the Kauai Police Department. Begley can't provide something (such as a report or investigation) that does not exist. Begley has identified many witnesses, none of which were deposed by any of the defendants, including Defendant Freitas.

**Case law does not require a Plaintiff (Begley) to depose his own witnesses, or even obtain their affidavits**, prior to trial. Celotex Corp. v. Catrett, 477 U.S. 317. Begley identified numerous witnesses to his facts, none of which

were deposed by the Defendants in this case. *Celotex* also states that "**depositions, answers to interrogatories, and admissions**" are "**evidentiary materials**" as listed in Rule 56(c).

## OTHER CLAIMS and CULPABILITY

It is clear from the numerous other complaints against Chief George Freitas and/or police officers that were under his supervision at the Kauai Police Department, that Begley is not the only individual who believes that there has been a serious problem with the policies and customs of the Kauai Police Department and Chief George Freitas. See Tokashiki v. Freitas (HI 2003) CV03-00065 and 9th Cir. 04-16157, Seto v. Freitas (HI 2003) CV03-00259 and 9th Cir. 04-17392, as well as Abbatiello v. County of Kauai (HI 2004) CV04-00562 among others.

As to the applicability of each law or claim in the Begley complaints, Begley will not here pretend to be an expert. This is why Begley initially allowed attorney Mark Zenger to take Begley's case. Zenger then asked Begley for permission to bring in attorney Chris Bouslog, which Begley verbally agreed to. Zenger and Bouslog decided which claims and laws were applicable and wrote the Begley complaints accordingly. Begley trusted their professional experience and knowledge, while Begley concentrated on recovering from his serious injury and trying to work again.

Immediately after the District Court's Orders granting Summary Judgment on behalf of the defendants in this case, Chris Bouslog stated that he would seek an appeal on Begley's behalf when the Courts Orders were certified by the District Court. Mark Zenger agreed with that course of action. Both attorneys later expressed their frustration that the District Court would not certify its Orders. Bouslog repeated to Begley on several occasions that he was going to appeal on Begley's behalf.

However, in November of 2005 Bouslog began to change his views, and in January of 2006, Bouslog completely changed his direction. He was no longer willing to appeal the Summary Judgment Orders, and was not willing to aggressively represent the Begley complaint. Mark Zenger expressed that Zenger was not an appellate attorney, and that Begley would have to find another attorney to represent Begley on appeal. Zenger repeatedly stated his belief that an appeal by Begley was appropriate, but that Zenger could not handle the appeal.

The bench trial in March 2006 was suggested and encouraged by County of Kauai's attorney, David Minkin. Minkin stated to Begley during the final (unrecorded) settlement conference on 01/17/2006, that a jury-waived trial would be the quickest route to a final judgment and the opportunity for Begley to file his appeal. All the attorneys in this action recognized the reasonableness of a Begley appeal at an interlocutory level (See Begley's case docket #108 on 11/07/2005).

The District Court was unwilling to certify its orders granting Summary Judgment. Now, Defendant Freitas' attorney suggests that in granting his attorney's fees, "*Plaintiff will be deterred from raising further groundless and harassing claims*" (Freitas' Memorandum in Support of Motion at page 9).

John Komeiji, the attorney for Defendant George Freitas, practiced law in the same law firm with Magistrate Judge Kevin S. Chang for approximately 12 years. Both men were partners in this law firm (Watanabe, Ing & Kawashima/ Komeiji). One of Magistrate Chang's former law clerks, Gary Suganuma, joined John Komeiji's law firm in 2003. John Komeiji also served (and may still serve) as a mediator for the District of Hawaii, under the Mediation Judge, Magistrate Kevin S. Chang. For Magistrate Chang to rule favorably for Defendant Freitas' attorney's fees may give the appearance of impropriety.

## FREITAS' BILL OF COSTS

Begley understands that Rule 54(d) creates a presumption in favor of awarding costs to a prevailing party. However, it also gives discretion to the District Court to refuse to do so. Berkla v. Corel Corp., 290 F.3d 983, 995 (9th Cir. 2002)

The losing party must show why costs should not be awarded. Stanley v. Univ. of Southern California 178 F.3d 1069, 1079 (9th Cir. 1999), Nat'l Info. Servs., Inc. v. TRW, Inc., 51 F.3d 1470, 1471-72 (9th Cir. 1995)

A District Court can "specify reasons" for its refusal to tax costs to the losing party. Assoc. of Mexican-American Educators v. California, 231 F.3d 572, 591 (9th Cir. 2000); Subscription Television, Inc. v. Southern Cal. Theatre Owners Ass'n, 576 F.2d 230, 234 (9th Cir. 1978)

In *Stanley*, the Ninth Circuit held that the district court abused its discretion in rejecting a losing civil rights plaintiff's motion to deny costs to the defendant without considering: (1) the plaintiff's limited financial resources and (2) the chilling effect on future civil rights litigants of imposing high costs. *Stanley*, 178 F.3d at 1079.

The Ninth Circuit has so far approved several factors that would justify a district court's refusal to award costs to a prevailing party:

1. The losing party's limited financial resources. National Org. for Women v. Bank of Cal., 680 F.2d 1291, 1294 (9th Cir. 1982)

2. Misconduct on the part of the prevailing party. National Info. Servs., Inc. v. TRW, Inc., 51 F.3d at 1472 (9th Cir. 1995)

3. The importance of the issues. Assoc. of Mexican-American Educators v. California, 231 F.3d 572, 593 (9th Cir. 2000)

4. The importance and complexity of the issues,

5. The merit of the plaintiff's case, even if the plaintiff loses, and

6. The chilling effect on future Civil Rights litigants of imposing high costs. Stanley v. Univ. of Southern California, 178 F.3d at 1079 (9th Cir. 1999)

   Also see Save Our Valley v. Sound Transit (9th Cir. 2003).

**1. Begley has limited financial resources.**

Begley supports three (3) children who live at home, one of which is preparing for college. He pays a mortgage and several other loans. He is not an "organization". He continues to work for the Kauai Police Department, but his personal income and amount of overtime pay has been limited since the assault in 2002. Begley still has medical expenses. He still suffers the effects of the serious closed-head injury he received on May 17, 2002, and still takes prescription medication accordingly (Tramadol and Nortriptyline).

To pay a combined total of about $50,000 in attorney's fees and costs (based on the requests of Defendant's Freitas, Curnan and County of Kauai), would probably require the sale of Begley's house. Begley has already sought a home equity mortgage, and was denied. He has also inquired with the only listed bonding companies in Hawaii, neither of which offers an appeal bond. Begley is representing himself Pro Se before this court, and in his appeal to the Ninth Circuit Court of Appeals. Whatever monetary resources Begley has, or will have, Begley will need for his own representation. If Begley is forced to sell his house, or again seek a home-equity mortgage, the time involved (especially during the pendency of

Begley's appeal) and any resulting loss or stress would probably be insurmountable.

To grant Freitas' request for attorney's costs would cause irreparable harm to Begley and his family. To deny Freitas' request for attorney's costs would not cause irreparable harm to the County or the County's attorney. Municipalities account for contingent debts in their annual budgets. The County of Kauai is not peculiar in this regard. **All attorney's fees and costs for the Freitas' defense were allocated by the Kauai County Council for payment by the County of Kauai.** Over $100,000 was appropriated by the County for this purpose. The County of Kauai has its own full-time staff of County Attorneys, yet the County selected a large Honolulu-based attorney's firm to represent Chief Freitas.

**2. Misconduct on the part of the prevailing party**

The County of Kauai has lied and made significant misrepresentations to the District Court and the Plaintiff during the course of this case. (Refer to the DISCOVERY section above.) Recovery of Freitas' attorney's fees can only benefit the County of Kauai, since the County has covered all costs and fees for Freitas' defense from the County's budget. Therefore, the County's significant misconduct through it's hired attorney's should be considered here.

**3. The issues at hand are paramount.**

As of this writing, the Kauai Police Department has still not instituted an internal affairs unit, nor does it have any personnel permanently trained and assigned for that purpose. The County of Kauai continues to receive new claims and lawsuits against KPD and its Police Officers at an alarming pace.

Police Officers in small communities, such as Kauai, are well recognized by the public and shown a level of fear and/or respect regardless of whether the officer is in uniform or not, and regardless of whether the officer is working his regular tour of duty or not. A Police officer and his Department should not find refuge from the "Color of Law" because they wait until they finish their regular shift to promulgate illegal activity, or because they don't flash their badge and gun before they ratify illegal and unconstitutional acts in the furtherance of the unwritten policies and/or customs of their agency.

**4. The importance and complexity of the issues, and**

**5. The merit of Begley's case**

It is uncontroverted in Begley's case that Lieutenant Martin Curnan was the Vice Commander, and Acting Assistant Chief over the KPD Investigative Services Bureau, on May 17, 2002, the day of Begley's serious injury.

It is uncontroverted that Sergeant Mark Begley received a serious closed head injury, including brain damage and clinical evidence of a basilar skull fracture, while in the company of Curnan on the night of May 17, 2002. Begley still suffers from the results of those injuries today, and still uses prescription medication.

It is uncontroverted that Sergeant Mark Begley was a subordinate officer to Curnan that day, and had always been a subordinate officer to Curnan during the years prior.

It is uncontroverted that Lieutenant Curnan invited Begley to Curnan's KPD office during regular work hours that day of May 17, 2002. (Begley and Curnan disagree on who called who.) Begley met Curnan in front of Curnan's KPD office that day. Curnan was waiting in Curnan's KPD vice truck, at the KPD parking lot in front of Curnan's office, when Begley arrived.

It is uncontroverted that Lieutenant Curnan told Begley to get into his KPD truck, and then drove Begley to a cane field where Curnan's family members were working, and invited Begley to have a beer with Curnan. (Begley and Curnan disagree on the route that Curnan took to the cane field, and whether Curnan initially told Begley where they were going.)

It is uncontroverted that Lieutenant Curnan was at the same location as Begley throughout the remainder of the evening. It is uncontroverted that

Lieutenant Curnan was with Begley in transport to every location that evening except for the short drive allegedly from Buddy Wilson's house to the prosecutor's office parking lot behind the old Dairy Queen in Lihue. By Curnan's own admission, he and Defendant Nawai left Wilson's house together, shortly after Begley left, and they followed Begley to that location.

It is uncontroverted that some type of assault occurred that evening in the presence of Lieutenant Curnan, and that Begley, who was the only person injured, received a serious closed head injury.

It is uncontroverted that Lieutenant Curnan did not stop the assault, did nothing to report the assault, did not seek medical attention for Begley, and then lied to Begley's wife regarding the cause of Begley's injury and condition.

**A special relationship existed** between the acting Assistant Chief of Police, Lieutenant Curnan, and Begley. Begley was Curnan's subordinate and had followed Curnan's orders, directions, and requests for years. However, Begley had also questioned Curnan regarding the alleged criminal activity of Curnan's friends and family members. On the day of Begley's serious injury, Begley once again warned Curnan to curtail Curnan's association and protection of some of these people. Curnan testified (at the bench trial on March 7, 2006) that just prior to Begley's serious injury that night Curnan told Buddy Wilson that **Curnan would**

**take care of Begley**. Curnan also testified that before Curnan drove with Nawai to Begley's location at the County Prosecutor's office parking lot, **Curnan knew** there might be an affray between Nawai and Begley. **Refer to Attachment "F"** for Curnan's statements. When Curnan drove the seriously-injured Begley home, he lied to Begley's wife regarding the causation of Begley's injuries, discouraging her from seeking medical attention for Begley. Several months later, when Begley finally returned to KPD on light duty status, Lieutenant Curnan visited Begley during work hours in the office where Begley was working, and **told Begley to back him (Curnan) up.**

**A special relationship existed** between the Acting Assistant Chief of Police, Lieutenant Curnan, and the Chief of Police, Defendant George Freitas. Prior to the assault on Begley, Curnan claimed that Curnan and Chief Freitas were "in the same boat". Chief Freitas had not taken any action on prior reports of wrongdoing by Curnan. After the assault on Begley, and before Begley's return to KPD on light duty status, Chief Freitas told Begley that Curnan was a nice guy and Begley should think the same way. Chief Freitas did not immediately investigate the assault on Begley, and never conducted an internal investigation into the activities of Curnan that night. During the tardy KPD criminal investigation, KPD investigators told Begley that they only had one suspect, David Nawai (who KPD eventually arrested for Assault 1st degree). Curnan was never treated as a suspect,

or even as an accessory to the assault. Among other adverse and retaliatory acts, Chief Freitas threatened to fire Begley if Begley had a permanent injury and Begley did not obtain clearance for full duty status. Freitas questioned Begley, and then inquired with other KPD staff whether Begley was going to file a lawsuit. Freitas warned Begley not to talk to the press about what happened to Begley the night Begley was injured. All of these acts were done during regular work hours and while Freitas was the Chief of Police for KPD.

(Refer to CONSPIRACY section of above.)

**6. The chilling effect on future Civil Rights litigants of imposing high costs.**

The defendants in this case are requesting a total of about $50,000 in attorney's fees and costs. Freitas alone is asking for about $40,000 in fees and costs. This would have a significant and irreparable impact on Begley and his family, but it would have an even more chilling effect on many other Kauai residents who are paid less, and find themselves interacting with Kauai Police Officers on a daily basis (especially considering the very high cost of living in Hawaii, and the very limited housing on Kauai).

## IV. CONCLUSION

Plaintiff Mark Begley requests that the District Court deny the motions and requests for Defendant Freitas' attorney's fees and/or costs.

DATED: Kapaa, Kauai, Hawaii, May 30, 2006

MARK N. BEGLEY
5318 Makaloa Street
Kapaa, HI 96746

Pro Se Plaintiff